UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. 18-cr-10203-WGY |
| v. ) | |
| ) | |
| GREGORY RAFTERY, ) | |
| Defendant. ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant U.S. Attorneys, requests that on March 26, 2019 the Court sentence defendant, Greg Raftery (hereinafter, "defendant" or "Raftery"), to a six month term of imprisonment, a sentence that is six months below the low end of the United States Sentencing Guidelines ("Guidelines") as calculated by the United States Probation Office.

**Facts**

**A. Introduction**

In early 2017, the Massachusetts State Police ("MSP") began an internal investigation of several overtime programs within what was then known as Troop E.[1] Troop E was primarily responsible for enforcing criminal law and traffic regulations on Interstate-90, the Massachusetts Turnpike ("I-90"), which spans the Massachusetts/New York border to the Boston Harbor.

In early 2018, MSP announced that an internal audit had revealed over 40 troopers who were suspected of failing to work some or all of the overtime shifts for which they had been paid.

---

[1] Troop E has since been disbanded and its members and responsibilities absorbed into other MSP troops.

Soon after, the United States Department of Transportation and FBI began an investigation of the suspected overtime abuse.

As a result of that investigation, seven former troopers (including this defendant) and one former lieutenant were charged in this court with embezzling funds from an agency receiving federal funding, in violation of 18 U.S.C. §666.  As of this date, all eight have pleaded guilty to the charges.

      B.       **The Abuse of Troop E Overtime Programs**

In addition to salary for a regular 8-hour work shift, Troopers within Troop E were also able to earn hourly overtime pay equivalent to 1.5 times their regular hourly pay rate for various overtime assignments.  Depending upon seniority, troopers were paid between approximately $60-75 per hour, while Lieutenants could make $100 per hour, or more.

One of these overtime programs was the "AIRE" (Accident and Injury Reduction Effort) program.  The objective of the AIRE program was to reduce accidents, crashes, and injuries on I-90 through an enhanced presence of MSP Troopers patrolling I-90 and targeting vehicles traveling at excessive speeds and to reduce aggressive driving behaviors.[2]

Troopers were expected to issue a minimum of 8-10 citations for each AIRE shift.  Any failure to issue the required number of citations had to be explained to supervisors and command staff.  Repeated failures to meet this quota often resulted in a trooper being blocked from receiving such overtime opportunities.

---

[2] These shifts were 4-hours long and organized by letter according to a specific shift: A-AIRE from 7:30 a.m. to 11:30 a.m.; B-AIRE from 11:00 a.m. to 3:00 p.m.; C-AIRE from 3:30 p.m. to 7:30 p.m.; and D-AIRE from 7:00 p.m. to 11:00 p.m.

Investigation has revealed that these troopers performing AIRE overtime routinely and regularly did not work the full four hours required. Troopers assigned to these shifts who chose to abuse this overtime benefit would purport to write the minimum number of tickets, and then simply go home. In many instances, these troopers would obtain the minimum number of citations in an hour, or less.

In other circumstances, such as inclement weather, these Troopers would forgo writing any citations at all. In the event of such weather, policy required troopers working these overtime shifts to continue to work, *i.e.*, "re-deploy," as directed by superiors. In practice, inclement weather meant neither tickets, nor work, was required for troopers abusing the AIRE program. Reminiscent of a grade school "snow day," these troopers treated the AIRE overtime program as if it were a paid holiday.

**C. The Defendant**

1. Employment

Raftery became a Massachusetts State Trooper in approximately 2001 and was a member of the state police until his retirement in approximately April of 2017.

2. Defendant's Criminal Conduct

As noted above, Troopers were generally required to issue 8-10 traffic citations per AIRE shift in order to collect AIRE overtime pay. In order to generate these citations without working, Raftery created bogus citations through a series of coordinated steps.

Intending to show up for less than the entire shift, or not at all, Raftery spent time during his regular shift or paid details, obtaining information he needed to create the bogus citations for upcoming overtime shifts. First, Raftery obtained license plate numbers of drivers that Raftery

observed during his regular shift.  Raftery would then use his access to criminal justice information systems ("CJIS") to obtain the detailed driver information associated with the plate number.  This information was then entered into bogus traffic citations that were supposedly written during overtime shifts. The "agency" copies of these citations were provided to MSP as evidence that he had worked shifts or hours that he had not.[3]  In addition, Raftery would complete additional internal MSP AIRE paperwork and payroll submissions, which included a detailed listing of the nature of the fraudulent citations, the times of the fraudulent citations, the nature of the violations, and the fines supposedly imposed.

In one example of Raftery's fraud, the investigation revealed the following evidence for October 13, 2016.  Payroll records showed that Raftery worked his regular shift from 7:00 a.m. to 11:00 a.m. (and then worked a detail from 11:00 a.m. to 3:30 p.m.).  CJIS records showed that Raftery accessed CJIS and obtained RMV records for 8 motorists from 1:45 p.m. to 2:00 p.m. (*i.e.*, during the time for which Raftery was getting paid for the detail).

On Raftery's AIRE Activity Sheet (on which Raftery reported that he worked the AIRE shift from 7:00 p.m. to 11:00 p.m.), Raftery reported that he had issued traffic citations to the same 8 motorists from 6:58 p.m. to 7:50 p.m.  On Raftery's citations for the 8 motorists, Raftery also recorded that he had issued the citations to the 8 motorists from 6:58 p.m. to 7:50 p.m.

RMV records showed that **none** of the 8 motorists received traffic citations on October 13, 2016. In addition, Raftery's cruiser radio data showed that Raftery's cruiser was turned on at 7:22 a.m. (the beginning of his shift), and, was turned off at 2:47 p.m. (45 minutes before Raftery

---

[3]   Raftery destroyed identical copies of these citations that should have gone to the operators, courts, and RMV.

claimed to have left the detail). Raftery's cruiser was not turned back on until 7:45 a.m. the following day. In short, Raftery's MSP cruiser was off the entire time that he had claimed he was issuing tickets and working an AIRE overtime shift on the Turnpike.

Investigators found this pattern of fraud throughout Raftery's MSP records for 2015 and 2016 (*i.e.*, cruiser radio data, CJIS data, MSP paperwork, etc.). Investigators have determined that Raftery was not present for 287 AIRE overtime hours in 2015, and, 397.5 hours of AIRE overtime in 2016.[4] At a rate of $75 per hour, the loss to the MSP totaled $51,337.50.

## Advisory Sentencing Guidelines

The parties' positions with respect to the Sentencing Guidelines, which are set forth in pages 2-3 of the plea agreement, are:

(i)  in accordance with USSG §§ 2B1.1(a)(2), defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of imprisonment of less than 20 years;

(ii) in accordance with USSG §§ 2B1.1(b)(1)(D), defendant's offense level is increased by six levels because the offense involved a loss in excess of $40,000 but less than $95,000;

(iii) in accordance with USSG §§ 2B1.1(b)(10), defendant's offense level is increased by two levels because the offense involved sophisticated means;[5]

---

[4] In or about 2016, Raftery's total MSP compensation was approximately $219,669, which included approximately $87,607 in overtime pay, a portion of which included pay for AIRE overtime shifts. In or about 2015, Raftery's total MSP compensation was approximately $202,769, which included approximately $82,514 in overtime pay, a portion of which included pay for AIRE overtime shifts. In or about 2015, Raftery signed up for and received overtime pay for more than 140 AIRE overtime shifts. In or about 2016, Raftery signed up for and received overtime pay for more than 150 AIRE overtime shifts.

[5] The First Circuit and its sister circuits have stated that the illustrative list provided by the Guidelines is by no means exhaustive and that "'the [sophisticated means] enhancement properly applies to conduct less sophisticated' than the examples." *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (citing approvingly to *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir.

    (iv)    in accordance with USSG §§ 3B1.3, defendant's offense level is increased by two levels because the offense involved the abuse of a position of trust;

    (v)    in accordance with USSG §3E1.1, the U.S. Attorney agrees to recommend that the Court reduce by two levels defendant's adjusted offense level because of defendant's prompt acceptance of personal responsibility for the offense conviction in this case.

Accordingly, the total offense level is 13. Mr. Raftery's criminal history category is I, which results in a GSR of 12 to 18 months' imprisonment. Presentence Investigation Report ("PSR") at ¶¶40, 87.

---

2013)). In *Jennings*, the court rejected the defendant's narrow construction of sophisticated means, in part, "because the enhancement 'does not require a brilliant scheme, just one that displays a greater level of planning or concealment than [the usual type of crime at issue.]'" *Id*. (internal citation omitted).

    Moreover, the First Circuit has held that this enhancement is appropriate in cases involving numerous, even repetitive, steps regardless of whether each step was sophisticated. *See*, *e.g.*, *Foley*, 783 F.3d at 25; *see also United States v. Duell*, 463 F. App'x 214, 215 (4th Cir. 2012) (finding enhancement applied when defendant used a legitimate account for illegitimate purposes by creating false financial statements and forging signatures). In *Duell*, the defendant, a financial secretary for a local church, transferred money between the church's accounts for three years and ultimately deposited it into his business account. 463 F. App'x at 215. He then concealed the fraud simply by deleting the transactions from the report that he prepared for the oversight committee. *Id*. The Fourth Circuit found this to qualify as sophisticated means because "[the defendant] took deliberate steps to make his offense difficult to detect over a period of years." *Id*. at 216.

**Argument**

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a sentence of six months incarceration, a one year term of supervised release, and the payment of restitution to the MSP.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Mark Grady*
MARK GRADY
DUSTIN CHAO
Assistant U.S. Attorneys

Date:   March 21, 2019